John P. PARTON, Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent.

No. 82–1326.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1982.

Decided June 28, 1982.

 

Eugene F. DeShazo, Denton & DeShazo, Kansas City, Mo., for petitioner.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Thomas E. Dittmeier, U. S. Atty., St. Louis, Mo., William Kanter, Freddi Lipstein, Attys., Civ. Div., Appellate Staff, Dept. of Justice, Washington, D. C., for respondent.

Before FLOYD R. GIBSON, Senior Circuit Judge, BRIGHT and JOHN R. GIBSON, Circuit Judges.

PER CURIAM.

John P. Parton petitions this court for review of a Merit Systems Protection Board (MSPB) decision that affirmed the Federal Communication Commission's (FCC) action removing him from his position as a radio license examiner. Parton argues that the MSPB's decision, particularly with regard to his "error rate" in grading exams, was not supported by substantial evidence; that the MSPB improperly considered evidence that he had intentionally upgraded failing exams; and that the Office of Personnel Management (OPM) did not timely file its petition for reconsideration of an earlier MSPB decision. We affirm the MSPB decision.

I. *Background.*

From January 16, 1978, until April 11, 1980, John Parton served as a radio license examiner in the FCC's Kansas City region. He was principally responsible for administering multiple choice examinations to people seeking both amateur and professional licenses to operate radio transmitters. In that capacity, Parton graded the exams, either placing a scoring template over an examinee's completed answer sheet and counting the number of incorrectly darkened circles or comparing an examinee's answers to the master key and counting the incorrect answers.

In 1977, the FCC discovered that examiners in two offices had intentionally passed unqualified applicants. As a result, on Oc-

tober 15, 1977, the FCC requested its six regional directors to conduct spot checks of the exam-grading within their regions. The spot checks revealed no misgraded exams in four of the six regions, one error in the Boston region, and a significant number of errors in the Kansas City region, all on exams graded by Parton.

FCC investigators then regraded all of the 1979 exams that Parton had scored as passing and some of the exams that he had scored as failing. They found that, although none of Parton's failing grades were incorrect, he erroneously passed 158 out of 1,002 amateur examinees and 10 out of 157 commercial examinees.

On January 11, 1980, Fred Goldsmith, the Chief of the Internal Review and Security Division of the FCC, spoke with Parton regarding his poor work performance. Parton did not deny the alleged errors, and he admitted intentionally upgrading two applicants (an arthritic man and a grandmotherly woman) out of compassion.

On February 14, 1980, the FCC proposed removing Parton for unacceptable performance, effective April 11, 1980. Parton appealed to the MSPB, which held a hearing and made a preliminary decision upholding the removal. Upon review, the MSPB reduced the penalty to a thirty-day suspension because of the FCC's failure to give Parton an opportunity to improve. The OPM then petitioned for reconsideration, and on February 22, 1981, the MSPB entered its final decision reinstating Parton's removal on the ground that his performance was so inexcusable that the FCC was not required to give him a second chance. Parton petitions this court for review of that ruling under 5 U.S.C. § 7703 (Supp. IV 1980).

II. *Discussion.*

Section 7512(a) provides that an agency may take adverse action against an employ-

ee "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (Supp. IV 1980). The FCC argued, and the MSPB held, that removing an employee who issued radio transmitter licenses to unqualified people promoted the efficiency of the service.

Parton contends that the MSPB's decision to remove him was not based on substantial evidence. In particular, he claims that the FCC incorrectly calculated his grading error rate. The FCC computed the grading error rate by comparing the number of exams Parton erroneously passed—168—to the total number that he passed in 1979—1,159. Parton argues that a true error rate would compare the number of exams erroneously graded to the total number of exams graded, not just those given passing grades. Accordingly, because the MSPB's decision is based on an improperly calculated error rate, Parton argues that it should be set aside.

The FCC responds that this issue is not properly before this court, because it was not raised in the proceedings before the MSPB. On the merits, the FCC points out that whatever the true error rate may be, the uncontroverted fact remains that Parton incorrectly graded an abnormally high number of exams, sometimes with an excessively high error margin.[1] Furthermore, investigation disclosed that Parton erred only in the direction of passing unqualified applicants. By comparison, none of the other examiners in Kansas City or any other region committed more than a negligible number of grading errors.[2]

■ After reviewing the record, we agree that the MSPB's decision is supported by substantial evidence. Parton committed several times as many errors as any other examiner, and he offered no credible reason

---

1. Parton passed examinees with as few as 28 correct answers, when the minimum passing score was 37 out of 50. Parton's poor work performance appears especially inexcusable in light of the simple, mechanical nature of the grading task.

2. For example, the investigators regraded 300 of Edward Davidson's (Parton's coworker) exams, discovering only three errors. In each of the three instances, the score given by Davidson varied by only one point from the correct score.

for his substandard performance. His technical objection to the use of the term "error rate" has little merit, even if it were properly presented to this court.

Parton also contends that the MSPB should not have considered evidence of intentional upgrading because the notice he received from the FCC concerning his proposed removal was founded solely on unacceptable job performance. The FCC concedes that Parton did not face an independent charge of intentional upgrading, but contends that evidence of intentional upgrading was relevant to the charge of unacceptable performance. In any case, the FCC claims that Parton suffered no prejudice because the evidence of his poor performance alone is more than sufficient to warrant his removal.

█ We agree that the intentional upgrading evidence was properly considered. It was relevant to the charge of unacceptable performance, and Parton was given notice that this evidence would be considered because it was part of the documentation supporting the notice of proposed removal that he received from the FCC.

Finally, Parton argues that the OPM did not timely file its petition for reconsideration of the MSPB order reducing Parton's penalty from discharge to a thirty-day suspension. Under 5 U.S.C. § 7703(b), an employee who petitions for judicial review of an MSPB order must file the petition within thirty days of receiving notice of the order. Under 5 U.S.C. § 7703(d), when the OPM desires review of an MSPB decision, it must first petition the MSPB to reconsider its decision, and have that petition denied, before turning to the courts. Section 7703(d) contains no time limits, but Parton urges this court to read the two subsections together to require the OPM to petition for reconsideration within thirty days of the MSPB's decision. In this case, the decision that was subsequently reconsidered was entered on July 23, 1981, and the OPM filed for reconsideration on August 27, 1981.

The FCC responds that this issue also was not raised before the MSPB and thus should not be considered by this court. On the merits, the FCC contends that the time limits in 5 U.S.C. § 7703(b) should not extend to 5 U.S.C. § 7703(d). According to it, a petition for judicial review by an employee and a petition for reconsideration by the OPM entail different considerations, and it does not follow that the time limit for one should necessarily apply to the other. Nonetheless, if the thirty-day limit applies, the FCC argues that it should apply in its entirety, running not from the date of entry of the challenged order, but from receipt of notice of that order by the OPM. Because OPM received notice of the July 23, 1981 order on July 28, 1981, and filed its petition for reconsideration on August 27, 1981, precisely thirty days later, it concludes that the petition was timely filed.

█ Parton's timeliness argument is jurisdictional; his failure to raise it earlier, therefore, does not preclude us from considering it now. However, his argument is without merit. We have found no authority to support the application of the section 7703(b) time limits to section 7703(d), and in any case, OPM filed its petition for reconsideration within thirty days of receiving notice of the order.

In sum, we hold that substantial evidence supports the MSPB's decision, that all evidence considered by the MSPB was properly admitted, and that the OPM timely filed its petition for reconsideration.

Affirmed.